490 So.2d 214 (1986)
John JORGENSEN, Appellant,
v.
The GRAND UNION COMPANY, Appellee.
No. 85-1929.
District Court of Appeal of Florida, Fourth District.
June 25, 1986.
Paul Gamba, of Gamba & Schott, Palm City, for appellant.
R. Fred Lewis, of Magill & Lewis, P.A., Miami, and Reid & Ricca, P.A., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
This is an appeal from an order which granted appellee's motion to enforce settlement. We reverse.
Sometime in September 1984, appellant, who had an action pending against appellee, since 1983, told his lawyer that if he could settle the case within ten days, he should do so. He gave his attorney no specific figure that he would accept; but the record reflects that it was to be sufficient *215 to pay his medical bills, attorney's fees and costs, arising out of the claim which occasioned the action.
We know that his lawyer did not communicate with appellee's lawyer on the same day as the client authorized the settlement because appellant's lawyer testified at the hearing upon appellee's subsequent motion to enforce settlement as follows:
At some point in time, and I couldn't tell you the dates, but it would be probably shortly before the settlement letter [the letter indicated that it was the first notice to appellee's attorney of appellant's desire to settle] that I sent out. Mr. Jorgensen came in to see me, as he had on other occasions, and on this particular occasion, he told me that he needed to settle the case relatively quickly because he had a lot of financial pressure on him, just as he related.
And I don't recall exactly what the conversation was, and I suppose that the letter will speak for itself. But we made a settlement demand.
He further testified as to telephone conversations with the treating physicians about compromising their bills, which occurred after the conversation with appellant.
We know that appellant's lawyer sent a demand letter for $6,500, dated September 19, 1984; and we know that sometime before September 29, 1984, appellee's counsel agreed to pay appellant $6,500. Finally, we know that the ten-day requirement of settlement was critical to appellant because of his following testimony:
A I was being pressured by the doctor, the doctors were going to file suit against me for not paying my medical bills, and they had sent through the credit bureau ruining my credit, and saying, you know, give me so many days to pay the bills, or they were going to take legal action, and I got  you know, I got pressured  that is where it led me up at that point in time.
Q Did you get money from some other source?
A Yes, I did. I borrowed some money from my mother, to get out of the temporary financial bind I was in. And my mother loaned me the money, and it got me out of the bind at that present time.
Murphy's Law took hold of the matter after September 28, 1984, in that the check sent by appellee's lawyer to appellant's lawyer was not received until October 12, 1984, and was in the incorrect amount; namely, $7,500, which required its return. It is now mid-1986; and the client must wonder about the reality of the journey upon which he embarked in bringing a lawsuit for personal injury in 1983, agreeing to settle his claim in 1984 if it could be done in ten days, and watching the system churn thereafter.
The law is clear in that a client's express authority given to his attorney to settle his cause of action must be clear and unequivocal. Nehleber v. Anzalone, 345 So.2d 822 (Fla. 4th DCA 1977). It cannot be said to be clear and unequivocal when the record is void of any testimony as to what "to settle" meant to this non-lawyer client under the financial gun from his creditors and what it meant to his lawyer. It is equally clear that the burden to prove the settlement was on appellee. See Nehleber. That burden was not met when there is no proof that the matter was settled within ten days of the client's conversation with his lawyer.
This case points out how we lawyers and judges, by focusing on our verbiage and customs, can isolate ourselves from the frames of reference, language, thought processes and expectations of clients; and the problems that can arise by that isolation.
GUNTHER and STONE, JJ., concur.